Michael **SABO,** Nicholas **Wells,** Juan **Perez,** Alan **Pitts,** Billy J. **Talley,** Aimee **Sherrod,** and Tyler **Einarson** on behalf of themselves and all other individuals similarly situated, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 08–899 C.

United States Court of Federal Claims.

Dec. 22, 2011.

Brad Fagg, Morgan, Lewis & Bockius LLP, Washington, D.C., for plaintiffs. James J. Kelley, II, Charles P. Groppe, Morgan, Lewis & Bockius LLP, Washington, D.C., Barton F. Stichman, Amy F. Fletcher, National Veterans Legal Services Program, Washington, D.C., of counsel.

Douglas K. Mickle, Senior Trial Counsel, Bryant G. Snee, Deputy Director, Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, Tony West, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant. Jacob G. Wolf, Major, Military Personnel Branch, Army Litigation Division, United States Department of the Army, John S. Goehring, Captain, Air Force General Litigation Division, United States Department of the Air Force, Kathleen L. Kadlec, Lieutenant Commander, Office of the Judge Advocate General, United States Department of the Navy, of counsel.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

This matter is before the Court on the parties' Joint Motion for Final Approval of Class Action Settlement Agreement ("Mot. for Final Approval") (docket entry 132, Dec. 1, 2011). In this motion, the parties request that the Court approve the proposed settlement agreement between the United States and the class of plaintiffs in *Sabo, et al. v. United States*, No. 08–899 C.

### I. Background

Plaintiff class consists of men and women who served in the wars in Afghanistan and Iraq and who now suffer from Post Traumatic Stress Disorder ("PTSD") as a result of active combat. Compl. 1 (docket entry 1, Dec. 17, 2008); Am. Compl. ¶ 136 (docket entry 25, Sept. 2, 2009). Plaintiffs were subsequently separated from the military based, at least in part, on a finding of unfitness to serve due to PTSD. Am. Compl. ¶ 136. Plaintiffs filed a complaint against defendant seeking the disability retirement pay and benefits they claim they were owed upon separation. Compl. ¶ 1; Am. Compl. ¶ 1. Specifically, plaintiffs allege that the United States Department of the Army, the United States Department of the Navy, and the United States Department of the Air Force ("the Service Branches") failed to comply

with applicable statutes and regulations when they separated plaintiffs from the military and assigned them disability ratings of less than 50% for PTSD. Am. Compl. ¶¶ 2–3.

### A. Statutory Requirements for Disability Ratings

The disability rating assigned to each service member upon his or her separation is significant because it triggers certain post-service benefits. If a service member's disability rating is at least 30%, he or she can be medically retired. 10 U.S.C. § 1201(a)–(b). As a result of medical retirement, a service member will receive retirement pay that is based on the service member's disability rating multiplied by his or her retirement base pay or 2.5% of the member's years of service multiplied by his or her retirement base pay. *Id.* § 1401. Alternatively, if a service member's disability rating is less than 30%, he or she can be medically separated and will receive a one-time lump-sum severance payment. *Id.* § 1203(a)–(b); *see also id.* § 1212.

The various Service Branches have or had regulations effectuating certain provisions in Title 10 of the United States Code, *see, e.g.,* 10 U.S.C. §§ 1201(b)(3)(B), 1203(b)(4)(A), that required the Service Branches to apply the Veterans Affairs Schedule for Rating Disabilities ("VASRD") when assessing disability ratings. Army Regulation 635–40 para. 3–5(a) (2006); Air Force Instruction 36–3212 para. 1.7 (2006); Navy Instruction 1850.4E § 3801(b) (2002); Department of Defense Instruction ("DODI") 1332.39 para. 4.2 (1996) (rescinded 2008).

On January 28, 2008, Congress passed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), which provided that, "[i]n making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned . . . shall, to the extent feasible, utilize the schedule for rating disabilities in use by [DVA]."[1] National Defense Authorization Act for Fiscal Year 2008, Pub.L. No. 110–181, § 1642, 122 Stat. 3, 465 (2008) (codified at 10 U.S.C. § 1216a(a)(1)). This reaffirmed the Service Branches' obligation to follow the VASRD when assessing disability ratings.

On October 14, 2008, the Department of Defense issued a policy memorandum that replaced its prior regulation regarding disability ratings and effectively adopted the PTSD-related provision of the VASRD. U.S. Dep't of Def., *Policy Memorandum on Implementing Disability–Related Provisions of the National Defense Authorization Act of 2008 (Pub L. 110–181)* attachment at 19 (2008) ("DoD Memorandum").[2] According to plaintiffs, since the issuance of this regulation, the VASRD as it relates to PTSD has been appropriately applied. Pls.' Mot. for Summ. J. 17 (docket entry 90, Jan. 28, 2011) ("Since issuance of the October 14, 2008 Policy Memorandum, DoD and the Service Branches, when making eligibility determinations involving service members found unfit in whole or in part due to PTSD, have complied with the requirements of VASRD 4.129 and assigned affected service members with a disability rating of at least 50%.").

As a result of these statutes and regulations, the Service Branches were required to follow the VASRD when assessing disability

1. "Secretary concerned" refers, in relevant part, to
   the Secretary of the Army, with respect to matters concerning the Army; . . . the Secretary of the Navy, with respect to matters concerning the Navy, the Marine Corps, and the Coast Guard when it is operating as a service in the Department of the Navy; [and] . . . the Secretary of the Air Force, with respect to matters concerning the Air Force.
   10 U.S.C. § 101(a)(9)(A)–(C).

2. In pertinent part, the memorandum provided: The Military Department Secretary concerned will abide by 10 USC 1216a and 38 CFR 4.129, VASRD for disposition of Service members found unfit because of a mental disorder due

to traumatic stress. When a mental disorder that develops on active duty as a result of a highly stressful event is severe enough to bring about release from active military service, the rating agency shall assign an evaluation of not less than 50 percent and schedule an examination within the 6 month period following discharge to determine whether a change in rating and disposition is warranted.

DoD Memorandum attachment at 19. This Memorandum rescinded and replaced DODI 1332.39. *Id.* at 1 ("Military Departments shall no longer utilize [DODI 1332.39] but shall use direction contained in this policy memorandum.").

ratings for PTSD for the period after December 17, 2002[3] and prior to October 14, 2008—the span of time when class members asserted that they were allegedly assigned incorrect disability ratings for PTSD.

By statute, the Secretary of DVA is required to issue regulations that make up the VASRD. *See* 38 U.S.C. § 1155 ("The Secretary shall adopt and apply a schedule of ratings of reductions in earning capacity from specific injuries or combination of injuries."). The relevant regulation promulgated as a result of this statutory requirement mandates that,

> [w]hen a mental disorder that develops in service as a result of a highly stressful event is severe enough to bring about the veteran's release from active military service, the rating agency shall assign an evaluation of *not less than 50 percent* and schedule an examination within the six month period following the veteran's discharge to determine whether a change in evaluation is warranted.

38 C.F.R. § 4.129 (emphasis added). Plaintiffs claim that the Service Branches did not comply with this regulation, as they were required to do by the statutes and regulations cited above. Specifically, plaintiffs contend that the Service Branches failed to assign plaintiffs disability ratings of at least 50% when the appropriate Physical Evaluation Board found them unfit for duty due, at least in part, to PTSD. *See* Am. Compl. ¶¶ 39–43. Accordingly, plaintiffs claim that they are entitled to additional benefits and compensation.

### B. The Class of Plaintiffs and Their Proposed Relief

On September 21, 2009, in accordance with Rule 23(c)(1) of the Rules of the Court of Federal Claims ("RCFC"), the Court granted plaintiffs' motion to proceed as a class action, certified the class of putative plaintiffs, set forth the claims to be decided in the case, and appointed class counsel. Sept. 21, 2009

Order 1–2 (docket entry 33). The certified class of putative plaintiffs consisted of

> [a]ll individuals who (a) served on active duty in the U.S. Army, Navy, Marine Corps, or Air Force, (b) were found by a Physical Evaluation Board to be unfit for continued service due, at least in part, to the individual's [PTSD], (c) were assigned a disability rating for PTSD of less than 50%, and, as a result, (d) were released, separated, retired, or discharged from active duty after December 17, 2002, and prior to October 14, 2008 (regardless of whether such release, separation, retirement, or discharge resulted in the individual's placement on the Temporary Disability Retirement List [ ("TDRL") ] ).

*Id.*

■ Because the Court of Federal Claims employs an "opt-in" class action mechanism, *see* RCFC 23(c)(2),[4] once the Court certified the class in this matter, the Court approved a notice to all potential class members as well as content for a website that aimed to make information on the lawsuit widely available. Order Approving Notice to Class 1–2 (docket entry 45, Dec. 18, 2009). The parties began sending notices to approximately 4,300 prospective class members on January 19, 2009. Joint Status Report & Request for Stay (docket entry 46, Jan. 20, 2010).

The notice instructed the recipients that they could actively opt in to the class action and, therefore, be represented by class counsel and benefit from any relief obtained as a result of the suit, or they could "[d]o [n]othing" and retain their rights to pursue a lawsuit individually. Notice of Class Action 6–7 (docket entry 45-1, Dec. 18, 2009). The notice explained that, if a class member opted in to the lawsuit, he or she would be able to apply for prioritized review by the appropriate military board—either the Physical Disability Board of Review or the Board for Correction of Military Records of the class member's military branch. *Id.* at 5. The

---

3. This date is six years prior to the date on which plaintiffs filed their complaint. *See* 28 U.S.C. § 2501. See *infra* Part I.B for the complete definition of the class.

4. In *King v. United States,* the court explained that one of the ways RCFC 23 differs from its counterpart in the Federal Rules of Civil Procedure is that "it allows only 'opt-in,' but not 'opt-out,' class actions." 84 Fed.Cl. 120, 122 n. 2 (2008).

624

appropriate board, upon application by a class member, would correct that member's military records to show a rating of at least 50% for PTSD for the 6 months immediately following the date that member was released from service. *Id.* at 4. The board would then determine whether or not the class member's PTSD rating should be changed for the time following the first six months. *Id.* A "Class Action Opt–In Notice Form" that the recipients could fill out and return to the National Veterans Legal Services Program was attached to the notice. *Id.* at 9–10.

The case was subsequently stayed for approximately one year pending the administrative process associated with collecting responses from individuals who wished to opt in to the action and affording them the opportunity to apply to the appropriate board for prioritized review. Order Staying Proceedings Pending Administrative Review Process 1–2 (docket entry 47, Jan. 21, 2010).

On January 28, 2011, before the stay had ended, plaintiffs filed a motion to lift the stay claiming that the prioritized review process that had been established was too slow and did not adequately address plaintiffs' concerns. Pls.' Mot. to Lift Stay (docket entry 89). On the same day, plaintiffs filed a motion for summary judgment (docket entry 90). The Court also granted plaintiffs' motion to lift the stay. Feb. 14, 2011 Order (docket entry 93). Then, on March 22, 2011, the parties filed a joint motion to reinstate the stay because fruitful discussions had taken place. Joint Mot. to Stay (docket entry 99). The Court reinstated the stay to afford the parties time to negotiate a settlement. *See* Mar. 24, 2011 Order (docket entry 100).

On July 15, 2011, the parties filed a proposed settlement agreement (docket entries 113 and 114). Accompanying the agreement were exhibits containing relevant information about class members that had opted in to the class as of that date. The exhibits were thrice updated to reflect changes in the class as class counsel received information from the class members and from the government. *See* Joint Mot. to File Updated Settlement Agreement Exs. Under Seal (docket entry

117, Aug. 12, 2011); Second Joint Mot. to File Updated Settlement Agreement Exs. Under Seal (docket entry 125, Sept. 27, 2011); Third Joint Mot. to File Updated Settlement Agreement Exs. Under Seal (docket entry 130, Dec. 1, 2011). The final group of putative class members who wished to opt in was required to do so by August 2, 2011. *See* Joint Mot. for Prelim. Approval of Class Action Settlement Agreement ("Mot. for Prelim. Approval") 3 (docket entry 116, July 28, 2011). As of the filing of the parties' current motion for final approval, a total of 2,176 individuals had opted in to the class action. *See* Third Joint Mot. to File Updated Settlement Agreement Exs. Under Seal Ex. A.

### C. The Settlement Agreement

As noted, the proposed settlement agreement was filed on July 15, 2011. Approximately two weeks later, the parties filed their Joint Motion for Preliminary Approval of Class Action Settlement Agreement. *See* Mot. for Prelim Approval. The parties requested that the Court preliminarily approve the settlement agreement and establish a schedule for finalizing the settlement. *Id.* at 10–11. On August 12, 2011, the Court granted the parties' motion and preliminarily approved the settlement agreement. Aug. 12, 2011 Order (docket entry 119).

The proposed settlement agreement places class members into nine discrete categories, which are as follows:

1.  Class members who were separated with severance pay without being placed on the TDRL, have not received a military review board decision,[5] and received a disability rating of at least 30% from DVA;

2.  Class members who were retired for disability without being placed on the TDRL, have not received a military review board decision, and received a disability rating of at least 30% from DVA;

---

5.  Such review was incident to the expedited procedures that proved inadequate and led to plaintiffs' motion for summary judgment and the present settlement agreement.

3. Class members who were placed on the TDRL and have not received a military review board decision;

4. Class members who were separated with severance pay without being placed on the TDRL, have received a military review board decision, and were assigned a disability rating for PTSD of less than 30% from DVA;

5. Class members who were separated with severance pay without being placed on the TDRL, have received a military review board decision, and were assigned a disability rating for PTSD of at least 30% from DVA;

6. Class members who were retired for disability without being placed on the TDRL and have received a military review board decision;

7. Class members who were placed on the TDRL and have received a military review board decision;

8. Class members who were separated with severance pay or retired for disability without being placed on the TDRL, have not received a military review board decision, and received a disability rating of less than 30% from DVA; and

9. Class members who were separated with severance pay or retired for disability without being placed on the TDRL and have not received a disability rating from DVA for PTSD.

Settlement Agreement & Stipulation & Order of Dismissal ("Settlement Agreement") ¶¶ 7–19; Mot. for Final Approval 3–6.

When the proposed settlement is implemented, each class member will receive relief tailored to the specific circumstances of the category in which he or she has been placed. In general, the terms of the settlement agreement provide that a class member who was not placed on the TDRL after separation or retirement will have his or her military records changed to reflect that he or she was placed on the TDRL and was given a 50% disability rating for PTSD for the first six months following his or her separation or retirement. Settlement Agreement ¶ 6(i). Further, the settlement provides that a class member who was placed on the TDRL will

have his or her military records changed to reflect that he or she received a 50% disability rating for PTSD for the entire time he or she was on the TDRL. *Id.* ¶ 6(ii). Additional relief and the details of procedures attendant to changing applicable records are crafted to respond to the particular circumstances of each of the nine categories. *Id.* ¶¶ 7–19.

The settlement agreement contemplates that its terms will be effectuated, at least in substantive part, within six months of the Court's approval. *Id.* ¶ 6. At the fairness hearing held on December 12, 2011, the parties stated that preliminary steps have already been taken to implement the settlement in the event of approval. Hearing at 10:25:11, *Sabo et al. v. United States*, No. 08–899 C (Fed.Cl. Dec. 12, 2011) ("Sabo Hearing"). Additionally, the parties explained that some class members will be required to have in-person meetings with appropriate military personnel in order to have their records properly processed. *Id.* at 10:29:02. Defendant represented that once these meetings are held, the individual's claim would be processed expeditiously. *Id.*

Also, the parties agreed that this Court will retain jurisdiction over the claims in order to address any issues that may arise regarding the settlement's implementation. Settlement Agreement ¶ 20. The parties propose to submit a joint status report within sixty days of the date of this Opinion and Order and every ninety days thereafter. *Id.* The reports will provide the names of the class members whose military records have been changed pursuant to the settlement agreement. *Id.*

The settlement agreement makes no provision for the payment of attorneys' fees or costs. Although there is no established fee structure, the parties represent that they will work toward resolving the issue of fees and costs resulting from the suit. Mot. for Final Approval 16–17. Moreover, the parties maintain that "no attorneys' fees will be paid out of any settlement proceeds" and that "[a]ny eventual fees award will be paid by the Government and will have no impact on any Class Member's relief." *Id.* at 17.

*D. Notice to Class Members and Fairness Hearing*

On September 6, 2011, the Court approved the parties' proposed notice to class members who had opted in to the class action. Sept. 6, 2011 Order (docket entry 123). The notice informed class members of the settlement agreement, advised them of the settlement category in which they were placed and the percentile rating they were assigned, instructed them on how to approve of or object to the settlement, provided them with contact information for class counsel, and notified them that they may appear at the fairness hearing. *See* Notice of Prelim. Approval of Class Action Settlement & Further Notice of Hr'g for Final Approval of Class Action Settlement ("Notice of Prelim. Approval") (docket entry 123-1, Sept. 6, 2011). The notice also contained a two-sided form that class members wishing to respond could fill out. *Id.* at 13–14. On the form, each class member could indicate whether he or she approved of or objected to the settlement, write comments pertaining to the settlement, and request to appear at the fairness hearing. *Id.* The notices were sent to the class members on September 20, 2011. *See* Sept. 6, 2011 Order 1. The class members had until November 4, 2011 to consider the proposed settlement and to respond by mailing the enclosed form to the Court. *See* Notice of Prelim. Approval 14.

As a result of the notice, the Court received 517 responses from class members. Of those, 496 class members approved of the settlement, 14 disapproved, and 7 failed to indicate either approval or disapproval on the returned form. Additionally, 21 class members expressed a desire to attend the fairness hearing.

On December 12, 2011, the Court held a fairness hearing in Washington, D.C. At the hearing, counsel for both parties were asked to make opening statements regarding the settlement. Members of the class who attended the hearing were then invited to state their views regarding the settlement. One member of the class attended and spoke in favor of the settlement.

Prior to the hearing, another member of the class, who objected to the proposed settlement, requested to appear by telephone. Unfortunately, despite the efforts of class counsel, that member could not be contacted prior to the hearing. After the hearing, class counsel learned that the class member had responded to class counsel's communications. On December 13, 2011, in order to permit the class member to appear, the Court held a telephonic conference with the class member and counsel for the parties.

## II. Legal Standards

According to RCFC 23(e), a class action may be settled "only with the court's approval." RCFC 23(e). The Court may approve the settlement "only after a hearing and on finding that [the proposed settlement] is fair, reasonable, and adequate." RCFC 23(e)(2).

■ In general, "[s]ettlement is always favored," especially in class actions where the avoidance of formal litigation can save valuable time and resources. *Dauphin Island Prop. Owners Ass'n, Inc. v. United States*, 90 Fed.Cl. 95, 102 (2009); *see also Berkley v. United States*, 59 Fed.Cl. 675, 681 (2004) ("Class actions, by their complex nature, carry with them a particularly strong public and judicial policy in favor of settlement."). "Settlement proposals enjoy a presumption of fairness afforded by a court's preliminary fairness determination." *Berkley*, 59 Fed.Cl. at 681; *see also* Aug. 12, 2011 Order 2 (finding, upon preliminary review, that the settlement agreement in this case "appears to be fair, reasonable, and adequate").

After the favorability of and the presumption supporting settlement are recognized, the Court must determine that the proposed settlement is fair, reasonable, and adequate in order to approve it as final. *See* RCFC 23(e)(2). To determine the fairness of a proposed settlement, the Court may consider a list of factors that, although not definitive, is certainly instructive. *See Barnes v. United States*, No. 04–1335C, 2010 WL 1904503, at *2 (Fed.Cl. May 7, 2010) (noting that the "Federal Circuit has not provided a definitive list of factors to be used in evaluating a proposed settlement," but that certain "factors have been used commonly for this purpose"); *Dauphin Island Prop. Owners Ass'n,*

*Inc.*, 90 Fed.Cl. at 102 (explaining that there is no definitive list of applicable factors, but that many courts have considered particular factors when determining the fairness of a proposed settlement).

▆▆▆ The factors are:

1. "[T]he relative strengths of plaintiff's case compared to the proposed settlement";
2. "[T]he recommendation of the counsel for the class regarding the proposed settlement, taking into account the adequacy of class counsel['s] representation of the class";
3. "[T]he reaction of the class members to the proposed settlement, taking into account the adequacy of notice to the class members of the settlement terms";
4. "[T]he fairness of the settlement to the entire class";
5. "[T]he fairness of the provision for attorney fees"; and
6. "[T]he ability of the defendants to withstand a greater judgment, taking into account whether the defendant is a governmental actor or private entity."

*Barnes*, 2010 WL 1904503, at *2; *see also Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 102–03; *Berkley*, 59 Fed.Cl. at 681–82. The Court has considerable discretion regarding the weight to afford each factor given the factual context of the particular case before it. *Barnes*, 2010 WL 1904503, at *2 (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993)).

## III. Analysis

### A. The Relative Strengths of Plaintiffs' Case Favors Approving the Proposed Settlement

▆▆▆ When determining whether to approve a settlement, the Court first must consider the strengths of a plaintiff's case in relation to the proposed settlement. Overall, when looking at this factor, the Court must "explore how the case would proceed if the case were not settled." *Berkley*, 59 Fed.Cl. at 682, *see also Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 103. Consider-

ing the relative strengths of a plaintiff's case requires the court to take the following into account:

(a) The complexity, expense and likely duration of the litigation; (b) the risks of establishing liability; (c) the risks of establishing damages; (d) the risks of maintaining the class action through trial; (e) the reasonableness of the settlement fund in light of the best possible recovery; (f) the reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation; [and] (g) the stage of the proceedings and the amount of discovery completed....

*Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 102–03.

▆▆▆ Here, plaintiffs filed a complaint on December 17, 2008 and an amended complaint on September 2, 2009. Because of the two stays instituted at the parties' request, defendant did not file an answer or otherwise respond to the amended complaint. Plaintiffs filed a motion for summary judgment on January 28, 2011 to which defendant did not have occasion to respond because of the subsequent stay and settlement negotiations.

If the case were not settled, defendant would have the opportunity to respond to plaintiffs' motion for summary judgment and to plaintiffs' amended complaint. According to the parties' Joint Motion for Final Approval of Class Action Settlement Agreement, defendant would "assert a number of defenses in the event that it must answer the Amended Complaint." Mot. for Final Approval 12. Moreover, plaintiffs, as they note in the joint motion, bear the burden of proving that the Service Branches failed to follow the applicable statutes and regulations when they did not assign to plaintiffs a disability rating of at least 50% for PTSD. Accordingly, recovery is not certain and, given the procedural posture of the case, which has been ongoing since December 2008, it may take considerable time and resources to litigate the case on the merits. If plaintiffs were ultimately to prevail on the merits, the litigation process would substantially delay any medical or monetary relief they would be entitled to receive.

However, if the settlement agreement is approved, the parties represent that within six months of approval defendant will "take all steps necessary" to execute the terms of the agreement. Settlement Agreement ¶ 6; *see also* Mot. for Prelim. Approval 11. Additionally, at the fairness hearing, the parties explained that the government is already preparing to implement the terms of the settlement should it be approved in an effort to expedite the settlement's implementation. Sabo Hearing at 10:25:11. Accordingly, if the settlement is approved, time- and resource-consuming litigation would be avoided, and plaintiffs would receive relief more quickly than if they proceeded with litigation and succeeded on the merits. In light of these considerations, the strengths of plaintiffs' case in relation to the proposed settlement support final approval.

B. *The Recommendation of Class Counsel Regarding the Proposed Settlement Favors Approving the Proposed Settlement*

■ The second factor to consider when determining whether to approve a proposed final settlement is the recommendation of class counsel, with specific attention given to the adequacy of counsel's representation. In general, class counsel's recommendation should be afforded deference if the Court is "satisfied as to the competence of class counsel." *Berkley*, 59 Fed.Cl. at 708. To assess counsel's competence, the Court should consider counsel's qualifications and its own "observations of counsel['s] competence and effort throughout proceedings." *Id.* In addition to its competency assessment, the Court also must determine that "the settlement negotiations were not tainted by collusion." *Id.*

Here, counsel for plaintiffs—Mr. Brad Fagg, Mr. James J. Kelley, and Mr. Charles P. Groppe of Morgan, Lewis & Bockius LLP—have experience in class action litigation. Additionally, as the parties note in their joint motion, Mr. Fagg has extensive experience before the United States Court of Federal Claims. Mot. for Final Approval 13. Moreover, Mr. Barton F. Stichman, Ms. Amy F. Fletcher, Ms. Meghan K. Gentile, and the other attorneys of the National Veterans Legal Services Program who have worked steadily on this case have proven themselves to be subject-matter experts and, by virtue of their positions, have an abundance of experience dealing with legal matters concerning veterans.

Though the legal standards only require the Court to assess the competency of class counsel, the Court has observed that counsel for defendant have also been very capable. Specifically, Mr. Douglas K. Mickle of the United States Department of Justice is an expert in cases dealing with laws and regulations applicable to the military. He has effectively represented defendant throughout this case. The representatives from the Service Branches—Major Jacob G. Wolf of the United States Army, Lieutenant Commander Kathleen L. Kadlec of the United States Navy, and Captain John S. Goehring and Captain Joe Smiga of the United States Air Force—also made substantial contributions to achievement of the settlement.

Throughout the litigation and settlement processes, counsel for both parties have demonstrated themselves to be zealous, dedicated, and thorough. Indeed, this Court has previously noted that, in this matter, "the parties have been ably represented by counsel, who, in the opinion of the Court, have represented their clients zealously, creatively, and with civility." Aug. 12, 2011 Order 2. Moreover, nothing suggests that the settlement negotiations were anything but cooperative, fair, and transparent, a fact the Court previously recognized. *See id.* ("The negotiations were serious, informed, and noncollusive."). Accordingly, because of counsel's diligence and ability as demonstrated throughout the litigation and settlement processes, the Court is well satisfied as to their competency and skill. Therefore, class counsel's recommendation regarding the proposed settlement—that the settlement be approved—supports final approval.

C. *The Reaction of the Class Members to the Proposed Settlement Favors Approving the Proposed Settlement*

Next, the Court should consider the responses of the class members to the pro-

posed settlement, "taking into account the adequacy of notice to the class members of the settlement terms." *Barnes*, 2010 WL 1904503, at *2.

In mid-September 2011, notice of a proposed settlement that had been approved by this Court was sent to each of the 2,176 class members who opted in to the class action. *See* Sept. 6, 2011 Order 1. The 16–page notice explained the terms of the settlement, detailed each of the 9 categories in which a class member could be placed, identified the category in which the specific class member was placed, provided information regarding the fairness hearing, and enclosed a response form that the class member could complete and return to the court. *See* Notice of Prelim. Approval. The class members had over five weeks to consider the proposed settlement and to respond by mailing the enclosed form to the Court. *See id.* at 14. Class members were also encouraged to contact class counsel with questions or concerns. *Id.* at 12. In sum, the notice was clear, comprehensive, and informative.

Of the 2,176 class members, 517 responded to the notice, which amounts to approximately 24% of the class. Of the 517 class members who responded, 14 disapproved and 7 neither approved nor disapproved. Taken together, the number of disapprovals and failures to approve or disapprove approximates 4% of the responding class members (less than 1% of the total class), meaning that about 96% of the responding class members (about 22.8% of the total class) explicitly approved of the settlement. The disapprovals alone account for only 2.7% of the responding class members (less than 0.7% of the total class).

■ When only a small number of class members object to a proposed settlement, the Court should consider that as evidence weighing in favor of approving the settlement. *Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 104 (quoting *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 119 (3d Cir. 1990)); *see Nat'l Treasury Emps. Union v. United States*, 54 Fed.Cl. 791, 798 (2002) ("[T]here is no question that [a] small number of objections weighs in favor of the court's approval."). Additionally, the percentage of objections here is far lower and the percentage of responses is far higher than those in others cases where class action settlement agreements have been approved by this court. *See, e.g., Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 104–05 (approving settlement where 16% of the class responded and approximately 52% of class members responding objected to the settlement agreement); *Nat'l Treasury Emps. Union*, 54 Fed.Cl. at 798 (approving settlement where, out of over 200,000 total class members, 65 class members objected out of the 131 who commented on the settlement, nearly 50% of responding class members). Here, the fact that such a small percentage of class members responding to the settlement notice objected to the settlement or failed to indicate their approval or disapproval weighs in favor of final approval.

**D.** **The Fairness of the Settlement to the Entire Class Favors Approving the Proposed Settlement**

■ Fourth, the Court must "ensure that the terms of a settlement treat the class as a whole fairly." *Dauphin Island Prop. Owners Ass'n, Inc.*, 90 Fed.Cl. at 106. A settlement must be "uniformly available, yet simultaneously tailored to distinct groups within the class." *Berkley*, 59 Fed.Cl. at 711.

Here, the parties created nine different categories that each encompasses a certain grouping of class members. These categories are detailed and take into account pertinent factors, including, *inter alia*, whether a class member received a decision from a military review board, whether the class member had retirement status, and whether the class member had been placed on the TDRL. *See* Settlement Agreement ¶¶ 7–19; Notice of Prelim. Approval 5–10. The relief to each category of class members is tailored to the specific circumstances of those members, although all class members will have their military records corrected, if necessary, to reflect placement on the TDRL and will be assigned a disability rating for PTSD of 50% for at least the first 6–month period from the date the member was released from service. Settlement Agreement ¶ 6; Notice of Prelim. Approval 4. These changes will trigger ap-

propriate military benefits. Because the proposed settlement treats the class uniformly, but is sensitive to the class members' individual circumstances and provides for such accordingly, the fairness of the settlement to the entire class supports final approval.

### E. The Fairness of the Provision for Attorneys' Fees Favors Approving the Proposed Settlement

With regard to the fifth factor, the Court must determine whether the fee structure proposed by the settlement is fair, adequate, and reasonable. *Berkley*, 59 Fed. Cl. at 711 (citing *Staton v. Boeing*, 327 F.3d 938, 959 (9th Cir.2003)). Additionally, the Court should ensure that the fee structure does not create any type of conflict of interest for class counsel. *Id.*

Here, the parties have not yet reached agreement on the manner in which attorneys' fees and costs will be assessed. The parties state that, if they cannot reach an agreement on the issue of fees and costs, they will submit briefs to the Court after the Court renders its decision regarding settlement approval. Mot. for Final Approval 16. Moreover, they have determined that no attorneys' fees will be paid out of any settlement proceeds. *Id.* at 17. The fairness of the parties' agreement with regard to attorneys' fees—to attempt to settle the issue and not to pursue fees from the settlement funds—weighs strongly in favor of approval. *See Barnes*, 2010 WL 1904503, at *2 (finding a proposed settlement fair and specifically noting that "plaintiffs' attorney fees will not be paid out of the settlement proceeds").

### F. The Ability of Defendant to Withstand a Greater Judgment Neither Favors nor Disfavors Approving the Final Settlement

Finally, the Court must consider whether defendant could withstand a greater judgment. This is intended to help the Court assess fairness in light of the potential that a higher judgment could be awarded if

the matter were to be litigated. *See Berkley*, 59 Fed.Cl. at 713. However, "[t]he defendant's solvency is of minimal concern when the defendant is the federal government." *Id.* As the court has noted, "the government can always withstand greater judgment because of Congress's unlimited ability to tax." *Id.* However, this concept conflicts with the important consideration of the cost to taxpayers when judgment is assessed against the United States. *Id.* Therefore, defendant's ability to withstand greater judgment does not factor into the Court's consideration of the proposed settlement in this matter.

### CONCLUSION

Because all the relevant factors [6] weigh in favor of finding that the settlement is fair, and because the proposed settlement well addresses the concerns of plaintiff class in a detailed and rational manner, the Court finds that the proposed settlement is fair, reasonable, and adequate. Accordingly, the Court **GRANTS** the parties' motion for final approval and does hereby **APPROVE** the settlement agreement.

As proposed by the parties in the settlement agreement, this Court shall retain jurisdiction over the claims in this case in order to ensure the settlement's implementation. *See* Settlement Agreement ¶ 20. The parties shall submit a joint status report by **Tuesday, February 21, 2012** describing the parties' progress in implementing the settlement agreement. Thereafter, the parties shall file joint status reports at least every ninety days, beginning on **Monday, May 21, 2012**, informing the Court of the parties' progress in implementing the settlement agreement until all class members have received the relief to which they are entitled under the agreement.

**IT IS SO ORDERED.**

---

**6.** The sixth factor—the ability of defendant to withstand a greater judgment—is irrelevant in

this matter. *See supra* Part III.F.